## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 30 2019, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Michael B. Troemel
Lafayette, Indiana

Harold E. Amstutz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationships of:

X.S., A.S., L.S., and Ar.S. (Minor Children)

and

M.S. (Mother) and A.S. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 30, 2019

Court of Appeals Case No. 18A-JT-1915

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause Nos. 79D03-1711-JT-124, 79D03-1711-JT-125, 79D03-1711-JT-126, and 79D03-1711-JT-127

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Respondents, M.S. (Mother) and A.S. (Father), (collectively, Parents), appeal from the trial court's Order terminating their parental rights to their minor children, X.S., A.S., L.S., and Ar.S. (collectively, Children).

We affirm.

# ISSUES

Parents present seven issues on appeal which we consolidate and restate as the following two issues:

(1) Whether the trial court's conclusion that there was a reasonable probability that the conditions that resulted in removal would not be remedied or that continuation of the parental relationship posed a threat to Children was clearly erroneous; and

(2) Whether the trial court's conclusion that it was in Children's best interests to terminate Parents' rights was clearly erroneous.

# FACTS AND PROCEDURAL HISTORY

Mother and Father were married in March 2009 and have four minor children, X.S., born August 2009, A.S., born January 2011, L.S., born April 2013, and

Ar.S., born October 2015.[1] Parents' and Children's involvement with the Department of Child Services (DCS) dates back to 2012. Children have been declared children in need of services (CHINS) on two occasions prior to the instant proceedings for conditions including Mother's incarceration for habitual theft, Father's incarceration for fraud, Children being left with strangers, Mother giving Children adult medication so she could sleep, and Mother providing L.S. with Klonopin. In 2015, the family became homeless after some of Children set their house on fire playing with a lighter.

[5] Mother has been diagnosed with Bipolar Disorder I, Post Traumatic Stress Disorder (PTSD), and Borderline Personality Disorder. As a result of these conditions, Mother has experienced mood swings, irritability, mania, aggression, difficulty in concentration, and anxiety, among a host of symptoms. Mother has also experienced episodes of psychosis and hallucinations. On January 25, 2016, Mother was arrested following a physical altercation with her sister, who had been allowing the family to stay with her. Following her release from jail, Mother's mental health deteriorated, and she attempted suicide by running into traffic. Mother was hospitalized following this attempt. On February 8, 2016, a third CHINS proceeding involving Children was initiated because of Mother's mental health status and the fact that the family was homeless with Parents having no viable plan to acquire housing. That CHINS

---

[1] Mother voluntarily relinquished her parental rights to an older child in August 2009. Parents had a fifth child during the underlying CHINS proceeding. That child has also been removed from Parents' care but is not subject to the instant appeal.

proceeding resulted in an informal adjustment. Parents were offered a number of services, including mental health services and Homebuilders, an intensive four-week program to improve Parents' ability to provide a stable and secure home environment for Children.

During this period of informal adjustment, Father was convicted of traffic offenses and was again incarcerated. Father did not have a valid legal status in the United States. Upon his release from incarceration on the traffic offenses, Father was detained by the immigration authorities. Children were in Mother's sole care. While she was participating in Homebuilders, Mother leased a home that had multiple safety and habitability issues, including no running water, peeling paint, broken windows, and an unstable second story. While the family was staying in the living room of the home, part of the ceiling collapsed. After a city inspection of the property, the landlord gave notice to Mother that she would be evicted.

On August 2, 2016, a fourth CHINS proceeding was filed, and Children were placed with a foster family, where they resided throughout the instant proceedings. As part of the dispositional order of the CHINS, Parents were directed to procure and maintain stable housing. Parents were offered a variety of services, including individual and couple's counseling, medication management services, home based case management, and supervised parenting time. The permanency plan was reunification. On March 14, 2017, Father was provided bond funds by a community resource and was released from the custody of the immigration authorities.

[8] Parents initially made progress in their services and were allowed to care for Children on overnight visits. However, Mother's mental health declined during those overnight visits, as she experienced psychosis and hallucinations. Father was employed, and Mother was the sole provider of care for Children when Father was at work. Mother provided Children with sleeping pills that were inappropriate for their age. Mother was directed by DCS to cease medicating Children, but she did not. On a home visit, two of the Children were observed to be incapable of standing up as a result of having been administered this medication. In addition, a safety plan to prevent inappropriate touching between two of Children was not being followed, and Children reported that domestic violence was occurring between Parents. Visitation reverted to being fully supervised in a facility and remained so during the remainder of the instant proceedings.

[9] Mother attended individual counseling and engaged in medication management. In May 2017, Mother ingested an amount of Adderall that was inconsistent with her prescription, causing her to believe she was having a heart attack. Subsequent investigation revealed that Mother was storing some of her medication loose in a tool box and was not taking her oral medications as prescribed. Mother was placed on a management regime and was dispensed her oral medications on a weekly basis. As a solution to her inconsistency in taking her oral medications, in September 2017 Mother began receiving an injection of an anti-psychotic medication that greatly relieved her episodes of psychosis and hallucinations.

After Children were removed from her care, Mother had no fixed address until December 2016, when she procured a small apartment with financial assistance from a community resource. She subsequently moved to a two-bedroom and then to a three-bedroom apartment around September 2017. Based on an inaccurate report that she had no income and that Children were living with her, Mother's rent and her electricity were entirely subsidized. Upon his release from immigration custody, Father began living in the three-bedroom apartment with Mother even though he was not allowed to be on the lease or live there because of his immigration status.

Parents' DCS case was periodically reviewed, and a concurrent plan of adoption was added. On November 15, 2017, DCS filed a petition seeking to terminate the parental rights of Parents (TPR). Reports generated by one of Parents' service providers covering December 2017 and January 2018 revealed the following facts. Mother was arrested on November 28, 2017, for failing to appear at an initial hearing for a probation revocation proceeding. Mother was reportedly "shutting down and becoming desperate and depressed" in contemplation of the TPR proceedings. (Mother's Exh. B, Vol. III, p. 5). Mother was responsible for scheduling her appointments to receive her injection of the anti-psychotic medication but had received one injection a week late. Mother and Father continued to downplay concerns that their housing was in jeopardy. In January 2018, Father requested assistance in contacting a free immigration clinic. FCM Reggie Brown (FCM Brown) met with Parents and the director of the immigration clinic, and Father completed the forms to

file FOIA requests pertinent to his immigration case. Father's next immigration hearing was scheduled for December 2019.

[12] On February 12, 2018, and March 21, 2018, the trial court held TPR hearings. FCM Brown, who had been with the family since July of 2016, testified that he had ongoing concerns about Mother's mental health diagnosis and her ability to parent in that her mental health "appears to decline with the responsibility of being a primary care-giver, [C]hildren being in her care, um, has been my observation and a pattern that's been identified throughout the duration of the case." (Transcript Vol. II, p. 137). FCM Brown recounted that due to the severity and gravity of the safety concerns DCS had for Parents after the failed overnight visitation, DCS never attempted a trial home visit or unsupervised visitation for Children and that as recently as February 2018, Mother had been observed attempting to coach Children not to disclose unfavorable information. FCM Brown testified that it was in Children's best interests to terminate Parents' rights because Children "deserve permanency" and "this is a pattern behavior and cyclical thing with [Parents] that we've seen with . . . [Parents] having instability, not just housing . . . despite the intervention of services, [Parents] have not been successful in their services to rise to a level needed for reunification to take place." (Tr. Vol. II, p. 143). FCM Brown related that Children's current foster family had not rejected the possibility of adoption and that other families had expressed interest in adopting Children. He was confident that Children were adoptable and reported that their ages and history had not been a barrier to interest in adopting them.

[13] The Court Appointed Child Advocate, Mary Quinn (CASA Quinn), who had been with the family since the inception of the case, reported that Children were all on track with their educational and developmental milestones. CASA Quinn, who had observed Children in the family home, at school, in their foster home, and with Parents during supervised visits, testified that it was in Children's best interests to terminate Parents' rights due to Children's need for permanency and Parents' history of inability to "sustain adequate housing and adequate income and a safe environment for [Children]." (Tr. Vol. II, p. 115-16). CASA Quinn felt Children were doing better since removal from Parents' home because "although the foster parent [and] biological parent [sic] have very different parenting styles, [Children] can live with that. They have a harder time living with all the uncertainty that they had before they were removed from the home." (Tr. Vol. II, p. 116).

[14] Mother testified that for two months she had worked doing cleaning from 7:00 a.m. to 10:00 a.m., seven days a week, earning $400 every two weeks. Mother felt that she had not been offered services throughout the case and that it was never in the best interests of children for their parents' rights to be terminated "if you've done nothing wrong." (Tr. Vol. II, p. 162). Mother felt that her mental health issues were "more emotional than anything." (Tr. 166). Father testified that he worked from 10:00 a.m. to 3:00 p.m. on Mondays and Tuesdays and that he worked from 4:00 p.m. to 1:00 a.m. Thursdays through Saturdays. Father earned approximately $1,200 per month.

On July 10, 2018, the trial court entered its Order terminating Parents' rights to Children. The trial court entered thirty-two detailed findings, including the following:

> 8. The reasons for the third CHINS case also included instability. [Summary of circumstances of third CHINS].
>
> 9. The reasons for the fourth CHINS case included the same instability, incarceration, and mental health issues. [Summary of circumstances of fourth CHINS].
>
> * * *
>
> 13. Pursuant to the dispositional order and parental participation decree issued in the fourth CHINS case, Mother was offered the following services: individual therapy, group therapy, medication management, case management, random drug screens, and parenting time. Father was offered case management, random drug screens, and parenting time. These services have been exhaustive and have been designed to address the difficulties of the family.
>
> * * *
>
> 16. Mother reports current employment at Marshall's cleaning Monday through Sunday from 7:00 [a.m.] to 10:00 [a.m.] making $400.00 every two (2) weeks. Mother reports having such employment for approximately two (2) months. Mother has historically been unemployed due to inability to cope with the responsibility and stress of employment. Father reports current employment at Red Seven cooking in the mornings and washing dishes in the evenings as well as occasional employment at

Marshalls cleaning with Mother. Father has historically remained employed as the primary earner.

17. Both Mother and Father have a history of incarceration as noted above. At the onset of the fourth CHINS case, Father was incarcerated at the Tippecanoe County Jail. Father was transferred to a detention facility by immigration where he remained until May 2017. Mother is currently on probation.

18. There have been multiple moves since the third CHINS case. [Summary of moves].

* * *

20. Mother and Father then relocated to the current three (3) bedroom apartment via subsidized housing. Mother reported no employment/income resulting in $0.00 rent and the addition of an electric subsidy. Mother also reported [Children] would soon be residing in the home. Mother has not corrected such information with the subsidized housing authority. The home itself is appropriate. However, the stability of the home is at risk. Father is prohibited from leasing the apartment due to his illegal immigration status. Mother reports an agreement with the landlord to allow Father to reside in the residence and to continue to reside in the residence herself without [Children] but has failed to provide any documentation regarding said agreement.

21. Mother has historically struggled with mental health issues and treatment compliance.

* * *

24.  In September 2017, Mother reluctantly began monthly injections along with oral medication.  Mother is currently prescribed a long acting antipsychotic injection for mood stabilization.  Mother is also prescribed oral medication including Adderall as a stimulant to remain focused, Propranolol as an anti-hypertensive to control anger, Lamictal as an anti-convulsive to act as a sedative for sleep and to control mood, and Topamax as an anti-convulsive to control mood . . . Mother agrees that the injections have improved the stability of Mother's mood since October 2017 and that her mental health is more stabilized.  Mother reports a desire and intention to continue therapy and medication, including injections.

25.  A pattern has developed indicating the status of Mother's mental health is, in part, directly correlated to responsibility and stress.  Mother's mental health tends to suffer with increased responsibility of employment and/or parenting.  Mother will require ongoing medication and therapy throughout her life.  Mother's ability to parent is dependent upon Mother's strict compliance with treatment.  Although Mother agrees she has and will always have mental health issues, Mother believes the issues are generally just emotional problems.  Mother still struggles with insight regarding termination of parental rights often becoming angry and depressed followed by crying.

26.  As recently as March 2018, Mother's therapist reported that Mother is shutting down emotionally and mentally noting Mother is unable to think straight due to anxiety.  Mother has become increasingly desperate and depressed without a family plan if parental rights are terminated and appears very unstable.  Mother did not schedule her injection appropriately and received it one (1) week late.

* * *

30. CASA, Mary Quinn, supports termination of parental rights in the best interests of [Children]. [Children] are in foster care and are doing very well individually and as a sibling group . . . [Children] otherwise have no special needs and are adoptable. [Children] need continued consistency in parenting and education. [Children] need permanency for their future now. CASA [Quinn] specifically notes that "[h]istory shows it unlikel[y] they will be able to provide and maintain a safe and stable environment."

31. Although Mother and Father love [Children], continuation of the parent-child relationships would be detrimental to [Children]. Mother continues to believe [Parents] have done nothing wrong. On the contrary, [Children] have been involved with the child welfare system over the span of six (6) years and have been adjudicated CHINS twice. Any progress the parents have been able to make is routinely short-lived.

32. The historical pattern of instability for [Children] who have spent more than half of their young lives as CHINS outweighs any such short-term progress. Despite services provided to benefit the family and improvement in Mother's mental health, concerns remain regarding long-term stability and permanency for [Children]. [Parents] currently reside in subsidized housing at risk due to Father's immigration status and dishonesty regarding income and [C]hildren residing in such housing. Visits with [Parents] remain fully supervised and safeguards have been added to ensure all [C]hildren are supervised at all times. Mother's mental health has improved with injections but Mother is becoming increasingly depressed and unstable surrounding the termination proceeding.

(Appellant's App. Vol. I, pp. 38-41). The trial court found that there was a reasonable probability that the conditions that resulted in removal

of Children or the reasons for continued placement outside the home would not be remedied, the continuation of the parent-children relationships posed a threat to the well-being of Children, DCS had a satisfactory plan for the care and treatment of Children, and that it was in Children's best interests that Parents' rights be terminated.

Parents now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

It is well-settled that when reviewing the evidence supporting the termination of parental rights we neither reweigh the evidence nor determine the credibility of witnesses. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). In addition, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence. *Id*. "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id*. We must give due regard to the trial court's opportunity to judge the credibility of witnesses firsthand, and we do not set aside the trial court's findings or judgment unless it is clearly erroneous. *Id*.

## II. *Termination of Parents' Rights*

"[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.*

Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

[19] Termination of parental rights is an extreme sanction that is intended as a "last resort" and is available only when all other reasonable efforts have failed. *In re C.A.*, 15 N.E.3d 85, 91 (Ind. Ct. App. 2014). As such, before a termination of parental rights is merited, the State is required to prove a host of facts by clear and convincing evidence, the most relevant for our purposes being that there is a reasonable probability that the conditions which resulted in the child's removal and continued placement outside the home will not be remedied by the parents and that termination is in the best interests of the child.[2] Ind. Code §§ 31-35-2-4(b)(2)(B)(i), (C); 31-37-14-2. We address each of those factors in turn.

---

[2] Parents filed separate Appellant's Briefs in which they both assert that the trial court's conclusion that they pose a continued threat to Children's well-being was clearly erroneous. However, neither develops an independent argument on the issue. Given that we conclude that there was a reasonable probability that the conditions meriting removal would not be remedied, we decline to address the issue. *See In re A.P.*, 882 N.E.2d 799, 807 (Ind. Ct. App. 2008) (noting that the termination statute is written in the disjunctive and declining to address Father's argument regarding his continued threat to the child where the evidence supported trial court's conclusion that the conditions meriting removal had not been remedied).

### A. *Reasonable Probability Conditions Will Not Be Remedied*

[20] When reviewing a trial court's determination that the conditions that resulted in the child's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-43. First, we must identify the conditions that led to removal; second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. at 643. When engaging in the second step of this analysis, a trial court must judge a parent's fitness as of the time of the TPR proceeding, taking into account evidence of changed conditions, and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. This delicate balance is entrusted to the trial court, and a trial court acts within its discretion when it weighs a parent's prior history more heavily than efforts made only shortly before termination. *Id*. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id*.

[21] Here, the conditions resulting in Children's removal and continued placement were instability, incarceration, and Mother's mental health. The main issue of instability for Parents was maintaining stable housing. Although Parents were residing in an appropriate three-bedroom home at the time of the TPR hearing, the trial court's finding that this housing was at risk was supported by evidence that in order to procure their subsidized housing, Mother had misrepresented the household's income and reported that Children were living in the home

when they were not. In addition, Father was living in the home where he was not allowed due to his immigration status. Housing acquired by fraud is not stable housing, and the trial court acted within its discretion when it concluded that Parents' latest housing was part of an ongoing pattern of instability that indicated a substantial probability of future housing instability. *Id.*

[22] The second reason for removal and continued placement outside of the home was Parents' incarceration. At the time of the TPR hearing, neither Parent was incarcerated. However, the trial court found that Parents had a history of incarceration, which the trial court could, within its discretion, consider in making its TPR determination. *See In re K.E.*, 39 N.E.3d 641, 647 (Ind. 2015) (noting that when assessing changed conditions against patterns of habitual conduct, a trial court may consider a parent's criminal history). In addition, as recently as November 28, 2017, Mother had been arrested for failing to appear at an initial hearing on a petition to revoke her probation. The probation revocation court continued Mother on probation, subject to her completing a driving course, which, as of the TPR hearing, she had not completed. In addition, Father is not in the country legally. He had been married to Mother since 2009 and had his first child with her that year. Despite the length of time he had been in the country and his detention by immigration authorities, Father took no proactive steps to address his immigration status until January of 2018, after the TPR petition was filed. A trial court may "disregard the efforts . . . made only shortly before termination and to weigh more heavily [a parent's] history of conduct prior to those efforts." *In re K.T.K.*, 989 N.E.2d 1225, 1234

(Ind. 2013). We see no clear error in the trial court's findings or conclusions on this condition of removal. *E.M.*, 4 N.E.3d at 642.

[23] The last condition which resulted in removal of Children and their continued placement was Mother's mental health. Neither party disputes that Mother has grave mental health issues. The trial court found that Mother's mental health had improved since she began receiving injections in September 2017. However, the trial court weighed this recent improvement against Mother's marked mental health decline at the time of the TPR hearings, Mother's pattern of declining mental health when faced with the increased responsibility of work and childcare, and the fact that she exhibited a lack of insight regarding her mental health, as Mother felt that her mental health issues were simply emotional in nature. The trial court found that "[t]he historical pattern of instability for these [C]hildren who have spent more than half of their young lives as CHINS outweigh any such short-lived progress." (Appellant's App. Vol. II, p. 41). Thus, the trial court took into account evidence of Mother's improvements but found that her past patterns weighed more heavily in favor of termination, which was within the trial court's discretion. *E.M.*, 4 N.E.3d at 643.

[24] Father's main argument regarding the conditions of removal centers on Mother's mental health, as he argues that "[t]here can be no doubt that the primary reason for both parents [sic] parental rights being terminated was based on the mother's mental health issues (DCS Exhibits 3, 5)." (Father's Brief p. 11). We find that Father's characterization of the trial court's decision to

terminate Parents' rights to be overly narrow, as it appears from the many detailed findings entered by the trial court regarding Parents' housing instability that Parents' inability to provide stable housing was at least as important to its decision as Mother's mental health. Thus, it is inaccurate, as Father contends on appeal, that the trial court impermissibly terminated his rights based solely on Mother's mental health status or his unwillingness to live separately from Mother.

[25] Parents also direct our attention to evidence in the record that does not support the trial court's determination. These arguments are unavailing given our standard of review which precludes us from considering such evidence. *See id.* at 642; *see also In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016) (holding that a reviewing court may not "reverse a trial court's judgment based on a belief that the parent-child relationship should be preserved and support that determination by rummaging through the record to obtain evidence that *may* support the denial of a petition to terminate"). Because the trial court's findings and conclusions that there was a reasonable probability that the conditions which merited removal and continued placement of Children would not be remedied were supported by the record, we find no clear error. *See E.M.*, 4 N.E.3d at 642.

## B. *Best Interests of Children*

[26] Both Parents make a cursory challenge to the trial court's conclusion that termination of their parental rights was in Children's best interests. Our supreme court has recently recognized that one of the most difficult aspects of a

termination of parental rights determination is the issue of whether the termination is in the child's best interests. *Id.* at 647 (noting that the question "necessarily places the children's interest in preserving the family into conflict with their need for permanency"). The trial court's determination that termination was in the child's best interests requires it to look at the totality of the evidence of a particular case. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "In doing so, the trial court must subordinate the interests of the parents to those of the children involved." *Id.* We have held that a recommendation by both the case manager and the CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

[27] Here, the evidence established that Parents had a pattern of inability to provide for the safety and security of Children. Parents moved six times after the third CHINS proceeding was initiated. Mother provided inaccurate information to procure the subsidy that allowed Parents to live rent-free in the home where they intended to bring Children. Father was not allowed to be living in the home due to his immigration status, but he was living there regardless. The one attempt during the pendency of the case to return Children to Parents' care for overnight stays ended when two Children were inappropriately medicated, a safety plan to prevent inappropriate touching between two Children was not followed, and Children were exposed to domestic violence. Although Parents

engaged in services, they never made sufficient progress so that they could have unsupervised visits with Children.

[28]     Mother's progress on her mental health was just beginning as a result of her injected medication. The injections were not a cure-all, and Mother had exhibited a pattern of decline in her mental health when she was the sole caretaker of Children. Because of Parents' work schedules as of the TPR hearing, if Children were returned to Parents' care, they would be in Mother's sole care for long periods of time while Father worked. There was no evidence in the record that a plan had been put into place to ensure Children's safety during those periods. This is particularly troubling since Mother implied at the TPR hearing that she felt she had done nothing wrong in parenting Children.

[29]     On the other hand, Children were doing well in foster care and were meeting their educational and developmental milestones. FCM Brown and CASA Quinn were both in favor of termination. CASA Quinn in particular felt that Children had benefitted from the consistency afforded by their foster placement, as opposed to the uncertainty they had experienced in their life in Parents' homes. We find the opinions of FCM Brown and CASA Quinn should be accorded great weight, as both were rendered after having had long-term involvement with this family in a variety of circumstances.

[30]     Both Parents contend that it was not in Children's best interests to terminate their rights because DCS had not yet found Children an adoptive home. While recognizing that Indiana law does not require that an adoptive home be

identified at the time of the TPR proceedings, they argue that termination of their rights would not provide greater permanency for Children and that they should be afforded more time to parent Children. However, Children's current foster parents had not ruled out adoption, other families had expressed interest, and FCM Brown felt confident that Children would be adopted. In addition, we note that this is not a case where Children have been placed with a relative for years. *See, e.g.*, *In re R.S.*, 56 N.E.3d 625, 630 (Ind. 2016) (noting that delaying adoption would not negatively impact the child's need for permanency where the child was in a stable placement with a relative who planned to adopt). The trial court weighed the interests of Parents and Children and concluded that the circumstances merited termination in order to provide Children with the permanency Children required. Given the totality of the evidence and the opinions of FCM Brown and CASA Quinn, we cannot conclude that the trial court's conclusion that termination was in Children's best interests was clearly erroneous. *See A.D.S.*, 987 N.E.2d at 1158-59; *E.M.*, 4 N.E.3d at 642.

## CONCLUSION

Based on the foregoing, we hold that the trial court's conclusions that there was a reasonable probability that the conditions resulting in removal would not be remedied and that termination was in Children's best interests were not clearly erroneous.

Affirmed.

[33]     Kirsch, J. and Robb, J. concur